[Cite as *J.E. v. M.D.*, 2024-Ohio-5978.]

| | | | |
|---|---|---|---|
| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | | |

J. E.

    Appellee

    v.

M. D.

    Appellant

C.A. No.    2023CA0028-M

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF MEDINA, OHIO
CASE No.    22DV0189

DECISION AND JOURNAL ENTRY

Dated: December 23, 2024

CARR, Judge.

{¶1}    Appellant M.D. appeals the judgment of the Medina County Court of Common Pleas, Domestic Relations Division. This Court affirms.

I.

{¶2}    In September 2022, Appellee J.E. filed a petition for a domestic violence civil protection order for herself and her three minor children, S.D., L.D., and G.D., against M.D., whom she lived with and was also the father of her children. An ex parte order issued and a full hearing before a magistrate was later conducted. Thereafter, a full hearing civil protection order was filed October 11, 2022. M.D. filed objections, which were supplemented after the transcript was filed. The trial court overruled M.D.'s objections. M.D. has appealed, raising two assignments of error for our review.

II.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BECAUSE THE EVIDENCE OF THE RECORD WAS INSUFFICIENT TO SUPPORT THE GRANTING OF THE CIVIL PROTECTION ORDER AND THE JUDGMENT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶3} M.D. argues in his first assignment of error that there was insufficient evidence to support the issuance of the civil protection order and that issuing it was against the manifest weight of the evidence.

{¶4} "R.C. 3113.31(C)(1) permits any person to file a petition for a DVCPO alleging 'that the respondent engaged in domestic violence against a family or household member of the respondent or against a person with whom the respondent is or was in a dating relationship * * *.'" *H.B. v. Fye*, 9th Dist. Lorain No. 23CA011958, 2023-Ohio-3516, ¶ 7, quoting *A.G. v. Gain*, 9th Dist. Lorain No. 21CA011736, 2022-Ohio-95, ¶ 8. "A petitioner must show 'by a preponderance of the evidence that the petitioner * * * [is] the victim of, or in danger of, domestic violence.'" *H.B.* at ¶ 7, quoting *Lundin v. Niepsuj*, 9th Dist. Summit No. 28223, 2017-Ohio-7153, ¶ 19. "When a respondent challenges the sufficiency or weight of the evidence underlying the protection order, however, this Court applies the civil manifest weight standard." *H.B.* at ¶ 7.

{¶5} R.C. 3113.31(A)(1) states that:

"Domestic violence" means any of the following:

(a) The occurrence of one or more of the following acts against a family or household member:

(i) Attempting to cause or recklessly causing bodily injury;

(ii) Placing another person by the threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211 or 2911.211 of the Revised Code;

(iii) Committing any act with respect to a child that would result in the child being an abused child, as defined in section 2151.031 of the Revised Code;

(iv) Committing a sexually oriented offense.

(b) The occurrence of one or more of the acts identified in divisions (A)(1)(a)(i) to (iv) of this section against a person with whom the respondent is or was in a dating relationship.

**{¶6}** At the full hearing, both J.E. and M.D. testified. J.E. testified that she had been living with M.D. and their three children. At the time of the hearing, J.E. and M.D. had been in a relationship for about 14 years and had lived together for about 11 or 12 years. Their three children were born in 2011, 2013, and 2017.

**{¶7}** J.E. described the truly disturbing circumstances that the family lived in. Over the years, M.D. became obsessed and fixated on documenting different activities of the family, and, if time did not allow for the documentation to occur, neither could the activities. This meant that when the oldest child defecated in the toilet, the waste had to be saved in the toilet until all of the children and M.D. could gather around to look in the toilet and flush it together. When the oldest child had to use the restroom, someone had to accompany her, and the door had to be open. One time when the oldest child had to use the bathroom at night, J.E. took her, but that resulted in a huge fight with M.D. After that, the oldest child stopped asking for J.E.'s help to avoid the fights that occurred. Instead, the oldest child would wait, sometimes hours, for M.D. to take her. This sometimes resulted in the oldest child having accidents, which was upsetting to her. The eight- and five-year-old children were still wearing diapers. The youngest child was also not allowed to walk up the stairs or on the tile on the main floor, despite being five years old, because M.D. required that there be a video and picture of the experience. J.E. indicated that even if she would tell the children that it was alright to go do something, they would resist doing so, indicating that

J.E. was not in control and that they would need to wait until M.D. said it was okay to do so. The family also did not celebrate Christmas in 2020 or 2021, despite the fact that J.E. had bought and wrapped presents.

{¶8} Throughout the day, M.D. tasked the children with going through garbage, listing the items in an excel spreadsheet, and deciding which items to keep and which to throw away. This ongoing project could last into the evening and interfered with the children being able to eat, sleep, go to school, play, bathe, or brush their teeth. Because of this the children would become hungry and tired and succumb to meltdowns. There were times when the children did not eat for 24 hours; at that point, the youngest would complain of different bodily pains that went away after she had eaten. J.E. described that, at one point, the children went over a year without taking a bath and went several months without changing clothes due to M.D.'s desire to document certain events with photos and videos. The youngest child had never brushed her teeth until J.E. removed them from the home and had developed bleeding gums. The oldest child had had an infected toe for over a year that needed medical attention. There was no time for any type of schooling for the children and they had never been to any school, although M.D. told J.E. he had submitted paperwork for home schooling. In fact, the children had not left the property since 2020. The garbage documenting also led to the home being overrun with trash of all kinds, including piles of soiled diapers, which accumulated maggots and flies.

{¶9} The house had no air conditioning and was only heated by multiple space heaters as they had not had a working furnace or air conditioner in three years. J.E. averred that the smell in the summer would make her sick and the use of the space heaters would cause her to fear that the house would burn down leading to her not being able to sleep. The space heaters burnt out a

couple outlets in the house and sometimes smelled bad. J.E. complained of migraines and throwing up from lack of sleep. She testified that she would try to eat but she could not keep anything down. In addition, the dishwasher dumped water into the basement leading to the growth of mold there. J.E. also asserted that the drinking water did not work. J.E. also complained that the house was dusty because she could not clean because she was not allowed to move anything as M.D. was afraid something might get lost. She described the house as unlivable.

{¶10} J.E. was allowed to leave the property to go get groceries and other household items but was not allowed to visit family. J.E. only started doing some work from home for her family's business in the last few months. M.D. had not left the house since 2020 and did not have employment, although J.E. thought he had a business prior to when she met him. J.E.'s parents were allowed to come to the property to the detached garage to help fix things there, but they were not allowed in the house.

{¶11} When there was an argument with M.D., it would go on for hours, sometimes for over 24 hours. Several times, J.E. tried to leave during the fights and M.D. would block the door or pick her up physically and remove her from the door. J.E. indicated that M.D. had never hit her or threatened to kill her.

{¶12} J.E. attempted to get M.D. to change but he believed that his actions would allow the children to make better decisions in their lives. When J.E. threatened to leave, M.D. told J.E. that he would tell everyone that she was crazy and violent and no one would take her side. When J.E. told M.D. that he was controlling, he told her that he was not; she could try whatever she wanted, but she would just have to deal with the consequences. J.E. felt that she could not just

leave and take the children because the car did not have car seats, and nothing was in her name. She feared that M.D. would call the police for stealing the car if she left.

{¶13} When asked how M.D.'s actions affected J.E., she indicated that she thought she still might have some form of depression. M.D. made her feel like she was not intelligent and that she was not able to make good decisions. J.E. described the children as always being stressed and they would have meltdowns. After she and the children left the home, the children were still afraid to throw things away such as clothing tags and disposable cups. They expressed concerns that they would be in trouble if they did so. Nonetheless, J.E. testified that the children's progress has been amazing since leaving. They are excited to learn and J.E. wants to work with tutors to get them caught up so they can start in school the following year. All of the children are using the toilet and J.E. is looking into options for getting the children counseling.

{¶14} M.D. also testified at the hearing. M.D. owned a business in the past that did very well and so he no longer worked. He indicated that he had enough money such that neither of them needed to work. M.D. described his and J.E.'s relationship as difficult in that he and J.E. had trouble communicating. J.E. would get very angry, use profanity, and engage in name calling. M.D. indicated that he never knew what would set her off. M.D. testified that J.E. has hit, kicked, punched, and pushed him. She has also threatened to kill herself.

{¶15} M.D. indicated that most of the troubling circumstances in the household were due to mutual decisions to keep delaying certain activities. M.D. described the situation in the house as being a state of severe dysfunction. He admitted that the children's schooling was hampered, and that they did not leave the property. M.D. stated that the children were not prevented from brushing their teeth or bathing but also confirmed that the youngest child has never brushed her

teeth and the younger two children were still in diapers. M.D. also asserted that the children would not get in trouble for using the bathroom at night. M.D. maintained that the children wore the same clothes for days at a time because J.E. informed M.D. that she thought the washer was breaking. The children were not prevented from eating but typically only had a bigger meal and a snack in a day. Repairs in the house were not completed due to the state of the house.

{¶16} M.D. testified that J.E. spent most of her time with stray cats the family started taking care of or in the bathroom. M.D. indicated that J.E. had numerous Coach purses in the bathroom closet.

{¶17} M.D. denied ever hitting or threatening J.E. or threatening to harm the children. M.D. admitted that he and the family needed counseling to figure out why everything was so dysfunctional but still maintained the petition should be dismissed. M.D. acknowledged that the condition of the house was harmful to all of them and that his actions had harmed and caused mental distress to the children. He further admitted his actions occurred daily.

## Domestic Violence as to J.E.

{¶18} M.D. argues that the evidence does not support that he caused domestic violence with respect to J.E. Here, the trial court concluded that the record supported that M.D. engaged in menacing by stalking with respect to J.E.

{¶19} Domestic violence includes committing a violation of R.C. 2903.211. *See* R.C. 3113.31(A)(1)(a)(ii). R.C. 2903.211(A)(1) states that:

> No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person.

{¶20} A pattern of conduct "means two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents * * *." R.C. 2903.211(D)(1). Mental distress includes:

> (a) Any mental illness or condition that involves some temporary substantial incapacity;
>
> (b) Any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services.

R.C. 2903.211(D)(2). "Incapacity is substantial if it has a significant impact upon the victim's daily life." (Internal quotations and citations omitted.) *M.B. v. L.D.*, 9th Dist. Medina No. 23CA0006-M, 2023-Ohio-3560, ¶ 16. "Mere mental stress or annoyance does not constitute mental distress for purposes of the menacing by stalking statute." (Internal quotations and citations omitted.) *Id.* Moreover, this Court has noted that:

> R.C. 2903.211(A)(1) does not require proof that the offender explicitly threatened the victim. Instead, the offender's knowledge that the conduct will result in the victim fearing physical harm or suffering mental distress can be inferred by the circumstances. Also, [a] court must take everything into consideration when determining if [a person's] conduct constitutes a pattern of conduct, even if some of the person's actions may not, in isolation, seem particularly threatening.

*Id.* at ¶ 17.

{¶21} While this situation is undoubtedly not the stereotypical menacing by stalking scenario, we nonetheless conclude that M.D. has not demonstrated that the decision to issue the protection order as to J.E. was not supported by sufficient evidence or against the weight of the evidence in this unique fact pattern of evidence that was presented to the court. In reviewing the magistrate's decision, and the trial court's entry ruling on objections, while no explicit credibility

determinations were made, based upon the findings made, it is clear that the lower court found J.E.'s testimony to be credible.

{¶22} Overall, the record discloses very disturbing and controlling recurrent behavior by M.D. While there was no evidence of direct threats or actual violence, M.D.'s pattern of conduct undoubtedly knowingly caused mental distress to J.E. M.D. physically prevented J.E. from leaving during arguments and created circumstances which left J.E. feeling helpless. M.D. made J.E. feel like she was not intelligent and that she was not able to make good decisions. J.E. feared that if she took the children and left, M.D. would call the police and report that she had stolen the car as it was not in her name and the car did not have appropriate car seats. Even the children did not believe that J.E. was in control and essentially told her the same when she told them that they could go do something; they resisted, indicating that they had to wait for M.D. to okay the activity. M.D. also told J.E. that no one would take her side if she left as he would tell people that she was crazy and violent. When confronted with his controlling behavior, M.D. told J.E. that she was not prevented from doing anything, but she would have to deal with the consequences of her actions. There was evidence that M.D. controlled every aspect of the family's lives which resulted in the family having no schedule or routine. *See M.B.*, 2023-Ohio-3560, at ¶ 16 ("Incapacity is substantial if it has a significant impact upon the victim's daily life.").

{¶23} Even after having left M.D. and the house, J.E. testified that she believed she still may have some type of depression, implying that she had depression while she was with M.D. J.E. complained of sleep disturbances and migraines, which she blamed on not being able to sleep due to having to use the space heaters because they could not get the furnace fixed.

**{¶24}** Considering the totality of the evidence before the lower court, we conclude that M.D. failed to demonstrate that the trial court erred in granting the petition with respect to J.E.

<u>**Domestic Violence as to the Children**</u>

**{¶25}** While the lower court concluded that the children were also victims of domestic violence because they were subjected to menacing by stalking, we conclude that the grant of the petition can be supported on another basis: the children were abused children. *See* R.C. 3113.31(A)(1)(a)(iii).

**{¶26}** Pursuant to former R.C. 2151.031(B), an abused child includes one who "is endangered as defined in section 2919.22 of the Revised Code, except that the court need not find that any person has been convicted under that section in order to find that the child is an abused child[.]" Under R.C. 2919.22(A), "[n]o person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age * * * shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support." The Supreme Court of Ohio has noted that R.C. 2919.22(A) "is concerned with circumstances of neglect[.]" *State v. Kamel*, 12 Ohio St.3d 306, 309 (1984).

**{¶27}** Here, there was evidence that the children lived in an environment filled with trash containing flies and maggots because M.D. prevented the prompt disposal of the garbage. M.D. also prevented the children from engaging in basic hygiene including regular bathing, teeth brushing, and wearing clean clothes. The children were prevented from eating regular meals and from developing healthy sleep patterns. The children had not left the property in three years. They had not engaged in any consistent schooling. They had not been to a dentist or doctor in years. According to J.E., the home lacked drinking water, had mold in the basement, and relied on

dangerous space heaters for heating. Said succinctly, there was overwhelming evidence that M.D.'s actions subjected the children to neglect, rendering them abused children. We cannot say that M.D. has demonstrated that the trial court erred in issuing a protection order with respect to the children.

{¶28} M.D.'s first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED BY FINDING AN OBJECTION THAT FAILED TO BE SUSTAINED HARMLESS.

{¶29} M.D. argues in his second assignment of error that the trial court erred by concluding that the magistrate's failure to sustain an objection during the hearing was harmless.

{¶30} During the hearing, J.E. was asked whether she could tell from M.D.'s actions whether he knew the effect he was having on J.E. and the children. J.E. answered affirmatively, and then responded, over objection, that her oldest child had told her that M.D. had told the oldest child to put underwear on one of the younger children and to just tell the police that they were in diapers because sometimes they have accidents. J.E. averred that she took that as an indication that M.D. knew his conduct was wrong.

{¶31} The trial court, in ruling on the objections, agreed that the magistrate should have sustained M.D.'s objection made during the hearing. However, the trial court also concluded that the magistrate's error was harmless because there was no indication that the magistrate relied on that specific testimony in issuing the decision and there was an abundance of other evidence present that would support the decision.

{¶32} We conclude that M.D. has not demonstrated that the trial court erred in finding the error harmless. In reviewing both the protection order and the trial court's ruling on objections,

we see no indication that either relied on the inadmissible testimony. Furthermore, we agree with the trial court that the improper testimony was superfluous in light of the rest of the record before us.

{¶33} M.D.'s second assignment of error is overruled.

III.

{¶34} M.D.'s assignments of error are overruled. The judgment of the Medina County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

SUTTON, J.
CONCURS IN JUDGMENT ONLY.

STEVENSON, P. J.
CONCURRING.

{¶35} I respectfully concur in judgment only; however, I would affirm the trial court's grant of the civil protection order for the children due to M.D.'s menacing by stalking as the trial court found rather than as abused children as the majority does. M.D. asserts that he did not cause the children sufficient mental distress to support a finding of menacing by stalking. The trial court noted that M.D. admitted to causing the children mental distress, although he claimed that distress was caused by both his and J.E.'s actions. Not only did M.D. admit he caused the children mental distress, but the court also noted that J.E. testified the children showed symptoms of mental distress such as having meltdowns, being stressed out, and showing a continued fear of breaking M.D.'s rules by throwing items away even though they are no longer seeing him. Considering the totality of the evidence, I would also agree that M.D. failed to demonstrate that the trial court erred in granting the petition in this case based on M.D.'s menacing by his stalking of these children.

{¶36} Because I believe M.D. has not shown the court erred by granting the children a civil protection order due to M.D's menacing by stalking, I would not analyze whether the children are abused children under R.C. 3113.31(A)(1)(a)(iii). The trial court's ruling on objections appears to solely rely on the children being victims of M.D.'s menacing by stalking, not the children being abused children. While I agree with the majority that the record shows the children were neglected,

I would not affirm the trial court's opinion on a finding that the trial court did not make. I prefer to review decisions on a trial court's stated findings, and I would do so in this case.

{¶37} Accordingly, I respectfully concur in judgment only.

APPEARANCES:

BRENT A. CICERO, Attorney at Law, for Appellant.

GERALD D. PISZCZEK, Attorney at Law, for Appellee.